UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDRES F. CABEZAS**<br><br>Plaintiff<br><br>v.<br><br>**FEDERAL BUREAU OF INVESTIGATION,**<br><br>Defendant. | Civil Action No. 19-0145 (CJN)<br>(ECF) |

**OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Federal Bureau of Investigation ("Defendant" or "FBI"), by and through the undersigned counsel, respectfully submits this Opposition to Plaintiff's Cross Motion for Summary Judgment and Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment.

In this action under the Freedom of Information Act, 5 U.S.C. 552, *et seq.* ("FOIA"), Plaintiff is seeking FBI records of his prosecution in Florida. Initially, the Defendant moved for summary judgment during the pendency of Plaintiff's criminal appeals claiming, *inter alia*, withholdings under FOIA Exemption 7A. *See* ECF No. 9. Defendant withdrew the motion when Plaintiff's criminal appeals concluded and FOIA Exemption 7A expired. After producing some records as a result of the expiration of Exemption 7(A), Defendant refiled its dispositive motion, which is now pending. *See* ECF No. 37 ("Def's Memo."). Defendant argued that it conducted an adequate search and claimed withholdings under FOIA Exemptions 5, 6, 7(C) and

1

7(E). Specifically, the FBI conducted a comprehensive search of its CRS database using its associated indices to search and returned one main file and no reference files. *Id*. at 9-13. FBI invoked Exemption 5 to protect Operational Plan discussions as well as legal advice, Exemption 6 and 7(C) to protect third party PII, and Exemption 7(E) to protect tactical and operational plan information as well as database codes.

In his Cross-motion/Opposition, Plaintiff asserts that "[t]he evidence is overwhelming that the records yielded per the FBI's CRS search were insufficient for [his] FOIA request. Further, much of the information the FBI did find in the CRS is improperly withheld or not fully justified in the FBI's declarations." ECF No. 43-1 ("Pl's Cross/Opp'n"). He further asserts without support that "the FBI . . . has permitted records to exist outside the CRS against its policies while not undertaking the required expanded search" and conducted a "CSR-only" search. *Id*. Plaintiff believes "released documents and other official government records Suggest[] the existence of other responsive records in its Tampa and Maitland field offices, commercial email servers, or computer devices in its possession." *Id*. at 5. Plaintiff believes that because he did not receive a video is evidence that the FBI's search was inadequate. *Id*. at 6. Plaintiff further asserts that the purported absence of some records from his iPhone is some evidence of the FBI's search inadequacy. *See* Pl's Cross/Opp'n at 10. Plaintiff also believes that some unspecified information related to the "gmail" account used to sting him should have been part of the records he received *See id*. at 12-14.

Regarding the records withheld by the FBI and, specifically, the Operational Plan withheld pursuant to the deliberative process privilege under FOIA Exemption 5, Plaintiff argues that "[t]he privilege was lost when the FBI chose to adopt the document in a final decision."

2

Pl's Cross/Opp'n at 24-26. Plaintiff also argues that the Operational Plan has factual parts that should be segregable. *Id*. Regarding the Attorney-Client privilege under FOIA Exemption 5, Plaintiff also argues that "there is nothing confidential about [Plaintiff's] arrest" and that "[t[he FBI could have no reasonable expectation of confidentiality in information to be used in a criminal prosecution[.]" *Id*. at 27. Plaintiff challenges the FBI's FOIA Exemption 6 and 7(C) withholdings on the grounds that some of the names withheld are already in the public domain and have been publicly acknowledged and that there is sufficient public interest in purported law enforcement "misconduct" to offset the privacy balancing in his favor. *See* Pl's Cross/Opp'n at 16-20. Regarding the FBI's FOIA Exemption 7(E) withholdings, here too, Plaintiff is challenging the FBI's reliance on FOIA Exemptions 6/7(C) and 7(E) to withhold the Operational Plan in full. *Id*. at 23. Plaintiff also appears to argue that FOIA Exemption 7(E) cannot be claimed for "routine" law enforcement. *Id*.

      a.      **The FBI's Search was Adequate**

Before getting into specific issues that Plaintiff raises about the FBI's search and withholdings, it is important to address some general flaws in Plaintiff's overall contentions. It is important to note that it appears that Plaintiff is using FOIA improperly to somehow conduct criminal discovery. However, FOIA is not a substitute for discovery in criminal cases or in habeas proceedings. *Roth v. DOJ*, 642 F.3d 1161, 1177 (D.C. Cir. 2011); *North v. Walsh*, 881 F.2d 1088, 1094 (D.C. Cir. 1989) ("[T]he Federal Rules of Criminal Procedure and the FOIA provide two independent schemes for obtaining information [and] FOIA was not intended as a device [] to enlarge the scope of discovery beyond that already provided by the Federal Rules of Criminal Procedure."); *Kishore v. DOJ*, 575 F.Supp.2d 243 (D.D.C. 2008) ("FOIA was not a

device to enlarge discovery.").

Here, Plaintiff is attempting in a brazen manner improperly to use FOIA to somehow prove "misconduct" on the part of the Special Agent that conducted the investigation that led to Plaintiff's conviction.  *See* Pl's Cross/Opp'n at 18-20.  This is expressly prohibited in this Circuit as demonstrated above.  Moreover, "[d]iscovery in a criminal case is an entirely separate process from the maintenance of an investigative file, and it is generally not known through a review of the FBI's investigative files whether certain documents were disclosed through trial." *See* Exhibit A, Third Declaration of Michael G. Seidel at 3 ¶8 ("3d Seidel Decl.").  "It is not necessarily the case that all documents received by a defendant in a criminal case through discovery would also be serialized into that individual's specific case file."  *Id*.  "FBI files are also entirely separate from the files that the U.S. Attorney's Office uses in the course of criminal prosecution.  Therefore, there may be variations in version or format of documents found in the FBI's investigative files and publicly available documents on the docket of *United States v. Cabezas*, Case No.6: 17-cr-00148 (M.D. Fla.)."  ECF No. 24-1 at 6 ¶12.  All documents provided to Plaintiff in the context of his FOIPA request have been produced as found in his FBI file.  *Id.*; *see also Coss v. DOJ*, 133 F.Supp.3d 1 *5 (D.D.C. 2015) ("prosecutors and court-evidence clerks are not employees of the FBI.").

Much of Plaintiff's other generalized objection to the FBI's search is steeped in rampant speculation.  For example, Plaintiff speculates about what documents may or may not exist within CRS.  *See* Pl's Cross/Opp'n at 7-8.  Specifically, Plaintiff speculates that "[t]he personnel file of the agents [that investigated him], as requested by" his criminal defense counsel should exist outside CRS.  Even if such documents existed outside CRS, it is unclear how they

4

would be responsive to Plaintiff's FOIA request or clearly protected under exemptions given the employees' privacy interests. *See* 3d Seidel Decl. at 6 ¶ 12. In the same vein, Plaintiff speculates that there is an "undercover proposal" responsive to his request exists, *see* Pl's Cross/Opp'n at 7, but there is not one and any undercover program information, to the extent it exists, is likely located in a separate case file and pertains to a larger undercover operation that is not specific to Plaintiff's case. *See* 3d Hardy Decl. at 5-6 ¶ 11. Thus, the FBI does not consider this proposal responsive to Plaintiff's request. The presumption of good faith cannot be overturned by purely speculative claims. *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991); *see also Oglesby v. Dep't of the Army*, 920 F.2d 57, 61 n13 (D.C. Cir, 1990) (mere speculation, without more, is not enough to create a question of fact as to the adequacy of OIP's search). Indeed, "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).

Regarding the appropriateness of the methods the FBI used to search for responsive records and Plaintiff's more specific objections to the methods, he argues that "[n]one of the records released nor descriptions of items withheld show any such investigation [into child pornography] occurred" or a video that Plaintiff believes exists. *See* Pl's Cross/Opp'n at 6. Plaintiff himself stated in his criminal appeal that he viewed a disturbing video, but had not kept it. *See* 3d Seidel Decl. at 4 ¶8. "The FBI's investigation of Plaintiff was solely based on a charge of online enticement of a minor, as detailed in the criminal complaint in his criminal case, *United States v. Cabezas*, Civil Action No. 6:17-cr-00148-PGB-LRH (M.D. Fl.). *Id*. Since the investigation into Plaintiff was based on enticement of a minor, the vast majority of records

5

produced to Plaintiff from his case file pertain to that charge. *Id*. As described in the Government's appellate brief, Plaintiff's eventual plea to the charge of receipt of child pornography was the result of his own admission that he had seen a child pornography video on the Dark Web, as well as the intervention of Plaintiff's family in the criminal proceedings. *Id*. Thus, since Plaintiff's plea was based on his admission and the FBI's knowledge of the specific child pornography video from a different case, the FBI did not possess the child pornography video in Plaintiff's specific criminal case file. *Id*. Plaintiff's criminal case file was located in the FBI's initial CRS search. *Id*. (citing Second Seidel Declaration at ¶¶ 14-26 (describing the FBI's earlier search)). The specific issue regarding the video was raised by Plaintiff in his criminal appeal challenging his conviction and his conviction was upheld by the 11th Circuit. *See USA v. Cabezas*, 18-10258 (11th Cir. 2019). *Id*.

Plaintiff also questions the adequacy of the FBI's search because it does not expressly say that the Tampa Field Office was searched. *See* Pl's Cross/Opp'n at 7-8. "As discussed in the Second Seidel Declaration, the CRS encompasses the records of all FBI Field Offices, including the Tampa Field Office and its Resident Agencies." 3d Seidel Decl. at 4-5 ¶ 9. In this instance, the FBI located Plaintiff's criminal case file from the Tampa Field Office using the indices to the CRS. *Id*. Given that the scope of the CRS includes all field office, legat, and all Headquarters files, the CRS remains the most reasonable place to search for responsive records to Plaintiff's request. *Id*. Additionally, FBI regulations no longer require requesters to write to specific field offices as a request to Headquarters will include a search of Field Office as described above. *Id*.

It is well-settled in this jurisdiction that a search is not rendered inadequate because it did not search its field offices. *Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996) (holding that the FBI's failure to contact its New York field office was not improper because the plaintiff's FOIA request made "no reference to the New York field office or, indeed, to New York"); *see also Dillon v. DOJ*, 102 F.Supp.3d 272, 276 (D.D.C. 2015) (rejecting the plaintiff's contention that the FBI should have searched the local records of the Minneapolis field office because the FBI's declarations established that records responsive to the request were not "reasonably likely to be found in locations outside of the CRS"); *Passmore v. DOJ*, 245 F.Supp.3d 191, 200 (D.D.C. 2017) ("Furthermore, because CRS 'spans the entire FBI organization and encompasses the records at FBI Headquarters [] FBI Field Offices, and FBI Legal Attaché Offices [] worldwide,' the search would have afforded access to the Philadelphia and Fort Washington field offices.").

Plaintiff also points to the absence of "[d]ocuments relating to seized evidence by a Task Force Agent" as evidence of an inadequate FBI search. Pl's Cross/Opp'n at 7. However, "[t]he record that Plaintiff indicates as evidence of missing records from the FBI's production is not an FBI document, but a Seminole County Sheriff's Office ('SCSO') record." 3d Hardy Decl. at 6 ¶ 13. "This document clearly indicates that the evidence in question was seized by a SCSO TFO, and entered into evidence by the SCSO, not the FBI." *Id*. Therefore, it is reasonable that the FBI would not maintain any records pertaining to evidence that was seized and stored by the SCSO. Plaintiff also argues that the FBI did not properly preserve records because chats with an undercover agent were not pulled from his own iPhone and added as records. However, the FBI maintains numerous records pertaining to the undercover operation

7

in Plaintiff's case, including Bates pages 167-216, which represent photos related to Plaintiff's undercover operation.  3d Seidel Decl. at 6-7 ¶ 14.  Whether or not the records that were serialized were pulled from Plaintiff's iPhone or another source is immaterial, as Plaintiff's preferred format of records does not dictate the FBI's recordkeeping procedures, and the undercover records were accounted for within the case file.  *Id*.  Moreover, as discussed earlier, *supra*, the bulk of the FBI's investigation pertained to enticement of a minor and not Plaintiff's receipt of child pornography, which was based on his own admission alone.  *Id*.[1]

As for the sting emails that Plaintiff refers to as being from a commercial server or official account emails, "[t]he FBI has provided the emails pertaining to Plaintiff's case that were memorialized as records."  3d Seidel Decl. at 7 ¶ 16.  "When creating records in a specific case file, FBI employees serialize documents that are of investigative value, and in this particular case, undercover emails of investigative value in Plaintiff's case were serialized and released at Bates 97-101."  *Id*.  "These emails were located within the FBI's search and were released in full to Plaintiff, which fulfills the FBI's obligations under the FOIA."  *Id*.  Because the FBI has provided these records to Plaintiff in full and without redactions, any claim arising from them would be moot.  "Once the records are produced[,] the substance of the controversy disappears and becomes moot since the disclosure which the suit seeks has already been made."  *Crooker v. Dep't of State*, 628 F.2d 9, 10 (D.C. Cir. 1980).

---

[1] The FBI has tried, without success, to return Plaintiff's iPhone.  *See* 3d Hardy Decl. at 7 ¶ 15.

Finally, regarding the adequacy of the FBI's search, its production did not include fingerprint records because "[f]ingerprints are maintained by the FBI's Criminal Justice Information Services Division ('CJIS'), and are kept separately from criminal case files. The FBI typically requests fingerprints from CJIS for processing only if a FOIA request specifically requests fingerprints." 3d Seidel Decl. at 8 ¶ 17. "Plaintiff's request did not mention fingerprints, and they were not contained in Plaintiff's criminal case file located within the FBI's CRS search; thus, the FBI did not locate or process any fingerprints within the scope of its reasonable search." *Id*.

  **b.**  **The FBI's Withholdings are Proper**

Plaintiff has failed to demonstrate that the FBI's withholding are not justified on the grounds that the FBI official acknowledged the exact same records previously or on the grounds of segregability, or that the documents are not deliberative.

  *i*  *FOIA Exemption 5 (and 7(E)) Withholdings are Justified*

Plaintiff's sole FOIA Exemption 5 challenge is limited to the Operational Plan. *See* Bates 121-132. The FBI withheld this document partially under FOIA Exemption 5 and also withheld it fully under FOIA Exemption 7(E). *See* 3d Hardy Decl. at 8 ¶ 18. Plaintiff's sole argument appear to be more related to whether the FBI can withhold this document in full under FOIA Exemption 7(E) without segregating any factual portions than it is about whether the document is actually deliberative. To be clear, "the arrest plan is inherently predecisional since it is drafted in anticipation of a specific operation. The FBI specifically asserted Exemption 5 only over portions of the operational plan which contains an AUSA's recommendations and legal analysis of the validity of the FBI's actions within Plaintiff's criminal case." 3d Seidel

9

Decl. at 8-9 ¶ 18. "These recommendations and legal analysis were contingent on predicted scenarios that were only speculated to potentially occur, and are both legally privileged between the FBI and its counsel, as well as deliberative." *Id*. Accordingly, the document was properly withheld on deliberative grounds. *See Paisley v. CIA*, 712 F.2d 686, 699, (D.C. Cir. 1983) (observing that "the information-gathering and deliberative process that produces" "a decision as to whether or not to prosecute someone" "is precisely the type of material to be protected as pre-decisional under Exemption 5").

"Additionally, with regard to Plaintiff's complaints about segregability, it is important to note that the operational plan in which the FBI asserted Exemption 5 is also exempt in its entirety pursuant to Exemption 7(E) and other underlying exemptions." Seidel Decl. at 8-9 ¶ 18. "Due to the numerous applicable exemptions, the pages on which the FBI asserted Exemption 5 are not segregable regardless of factual information within as that information is so intertwined and cannot be segregated." *Id*. In arguing that this document is segregable, Plaintiff also appears to be arguing that the Operational Plan has been publicly acknowledged and that, to the extent is pertains to a routine law enforcement procedure, it is not protected by FOIA Exemption 7(E). Because Plaintiff conflates these issues, Defendant will address them here rather than separately as a FOIA Exemption 7(E) objection.

"The operational plan at issue in this case is related to Plaintiff's arrest and includes placement of personnel, administrative and equipment information, deadly force authorization information, targets' background information, briefing locations, and legal consultations with the United States Attorney's Office. If the details of this plan were publicly known, others targeted by similar operations could predict the FBI's strategies and bolster their operational security to

10

avoid the FBI's attempts to arrest or investigative the targets further through such operations." Seidel Declaration, ECF No. 37-3. "Additionally, release of operational plans could potentially risk the lives of FBI agents and other law enforcement personnel executing these plans." *Id*.

It is fairly well-settled in this District that "[a]pplication of Exemption 7(E) for these documents is 'self-evident.'" *See Morley v. CIA*, 508 F.3d 1108, 1129 (D.C. Cir. 2007). FBI cannot reveal the details of these techniques and procedures because doing so would allow those seeking to circumvent the federal immigration laws to extrapolate what to avoid and how to prepare, increasing the risk that they enter or remain in the United States illegally. *See Pub. Emps. for Envtl. Resp. v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 205 (D.C. Cir. 2014) (finding agency properly withheld emergency action plans under Exemption 7(E) because "[t]errorists or criminals could use the information in the emergency action plans to thwart rescue operations . . . or to obstruct attempts to investigate the source of such a failure"); *Zeyad Abdeljabbar v. BATF*, 74 F.Supp.3d 158, 182 (D.D.C. 2014) ("ATF properly withheld pursuant to Exemption (b)(7)(E) the operational plans regarding the plaintiff's arrest.").

To demonstrate official acknowledgment of the information sought, the plaintiff bears the burden of showing: (1) the information requested [is] as specific as the information previously released; (2) the information requested match[es] the information previously disclosed; and (3) the information requested [ ] already ha[s] been made public through an official and documented disclosure. *See Dongkuk Int'l, Inc. v. DOJ*, 204 F.Supp.3d 18, 29 (D.D.C. 2016). Plaintiff has not demonstrated even one element of the official acknowledgment test let alone all. Plaintiff merely asserts that "[t]he withheld information here specifically relayed details of an arrest plan, which are disclosed in [Plaintiff's] publicly available criminal complaint and other open court

11

documents.   Pl's Cross/Opp'n at 22 ("I witnessed Cabezas pull into the Gander Mountain parking lot…").   One statement purportedly from the multi-paged Operational or Arrest plan does not constitute an official acknowledgement.   Moreover, disclosure by another agency and logical deductions made by the requester do not constitute official acknowledgement.   *Valfells, v. CIA*, 717 F. Supp. 2d 110, 118 (D.D.C. 2010).

FOIA requires that "any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are" otherwise exempt under the Act.   5 U.S.C. § 552(b).   This rule of segregation applies to all FOIA exemptions. *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 21 (D.C. Cir. 1984).   "It has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."   *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).   In *Ctr. for Biological Diversity v. Army Corps of Eng'rs*, 405 F.Supp.3d 127, 149 (D.D.C. 2019), this Court upheld the agency's segregability determination of documents that raised concerns similar to the operational plan at issue here because of the inextricably intertwined nature of non-exempt portions with exempt portions.   The same concerns exist in this case regarding the Operational Plan.

    *ii.*  *FOIA Exemption 6 and 7(C) Withholdings are Justified*

Plaintiff challenges the FBI's FOIA Exemption 6 and 7(C) withholdings on the grounds that the FBI "ha[s] already been revealed in released documents [] government public domain documents . . . [and] publicly-released agents' names."   Pl's Cross/Opp'n at 19.   Plaintiff also argues that "the public interest in the misconduct" outweighs any privacy interest.   *Id*.   First, Plaintiff does not describe any misconduct and therefore presents nothing to balance a public

12

interest against. The D.C. Circuit has held categorically that, unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991). Plaintiff has not identified any illegality. *See* 3d Seidel Decl. at 9 ¶ 19 ("[T]here is no evidence of misconduct aside from Plaintiff's unsupported allegations, and any interest the release of individuals' identities would serve is only Plaintiff's own personal interest in invalidating his conviction."). Thus, the Court need "not linger over the balance; something, even a modest privacy interest, outweighs nothing every time." *National Ass'n of Retired Federal Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989).

"Therefore, the FBI determined that the individuals whose names have been redacted have a strong privacy interest which outweighs Plaintiff's non-existent claims of public interest." 3d Seidel Decl. at 9-10 ¶ 19. And the FBI's balancing is correct because "Plaintiff's interest in overturning his own conviction has no public interest weight. *Oguaju v. United States*, 288 F.3d 448 (D.C. Cir. 2002), *reversed and remanded on other grounds*, 541 U.S. 970 (2004). "While certain FBI employees may have had their identities disclosed in certain contexts within the responsive records to match the public record, such as on Bates page 86, the FBI does not disclose the identities of its lower level employees within investigative records without an overriding reason to do so." 3d Seidel Decl. at 10 ¶ 19a. "This is because the association of a particular agent or employee with a certain investigative action within a specific case file could lead to harassment, targeting, or retaliation against those employees by criminals who may hold a grudge due to that specific investigative action." *Id.*; *see also Schwarz v. Dep't of Treasury*, 131

13

F.Supp.2d 142, 150 (D.D.C. 2000) (redaction of identities of certain federal employees was justified because "[d]isclosure of these names could subject the individuals to unwanted harassment but would not contribute to the public understanding of government functions"); *Voinche v. FBI*, 940 F.Supp. 323, 330 (D.D.C. 1996) ("There is no reason to believe that the public will obtain a better understanding of the workings of various agencies by learning the identifies of [various federal employees]….").

Likewise, Plaintiff's argument that the redaction of non-FBI federal employees is unavailing. *See* Pl's Cross/Opp'n at 19. Plaintiff argues that, because "[t]his information has been released to the public and cannot be exempted." *Id*. This argument is precluded by caselaw cited above. *See also* 3d Seidel Decl. at 11 ¶ 19(b) ("The FBI protected the name of an AUSA who was mentioned in a non-public context within an investigative record. For the same reasons as above, the disclosure of the AUSA's name in this context would constitute an unwarranted invasion of privacy."). Regarding the names of local law enforcement personnel, "although some local law enforcement personnel names may have been made public in certain contexts on Plaintiff's criminal docket, the FBI continues to assert that release of these employees' names within the specific investigative context of these records would constitute an unwarranted invasion of privacy and would put these employees at unnecessary risk of retaliation and potential violence." 3d Seidel Decl. at 11 ¶ 19(c); *see also Judicial Watch, Inc. v. FDA*, 449 F.3d 141. 152 (D.C. Cir. 2006) (upholding the trial court's determination that the contested names and addresses were properly withheld from records containing information on multiple individuals, citing the risk of violence.). Similarly, the risk of "undeserved negative attention on an individual" who is a third-party merely mentioned and individuals of

14

investigative interest also justifies the FBI's withholding. *See* 3d Seidel Decl. at 11-12 ¶¶ 19(d), 19(e).

     *iii.*  *FOIA Exemption 7(E) Withholdings are Justified*

  Plaintiff challenges the FBI's FOIA Exemption 7(E) withholdings of purported undercover communications on the grounds that "[t]he information withheld per this exemption has already been disclosed to the public," Pl's Cross/Opp'n at 20-21; the operational or arrest plan, which has already been addressed above, *see id.*; database information. *Id.* at 23. Plaintiff argues that "[t]he FBI cannot claim it protected the URLs and sensitive details of investigative databases when they are not FBI investigative databases." *Id.*

  Exemption 7(E) protects law enforcement records or information when release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E); *see also Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009) ("the importance of deterrence explains why the exemption is written in broad and general terms" and further explains why the exemption looks "not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk"). Here, the FBI "protected numerous details regarding its undercover activities within Plaintiff's criminal case, including Bates pages 167-216." 3d Seidel Decl. at 12-13 ¶ 20(a). "The FBI has released limited information regarding undercover operations and communications in order to mirror information that was identically located in the public record." *Id.* "The FBI protected all other non-public information regarding undercover operations, including details regarding techniques, the setup of the operation itself, and photos related to the

undercover operation. While limited information regarding the undercover operation in this case is public, disclosure of any further information could damage the FBI's undercover program and the use of such techniques in future cases." *Id*. "Revealing further details about the undercover communications in this case could provide criminals valuable details as to the types of devices, technology, and procedures used in this type of undercover operation, and would decrease the efficacy of the FBI's undercover techniques, in turn allowing future criminals to more easily evade detection by law enforcement." *Id*. (addressing undercover phone call also). Thus, given the harm that disclosure of the FBI's undercover operations would cause, the FBI properly protected this information pursuant to Exemption 7(E). *See id*.

Exemption 7(E) only requires a logical demonstration of the risk that the law would be circumvented, and Defendant has met this standard. *See Mayer Brown*, 562 F.3d at 1194. Here, the FBI has demonstrated his logical connection by showing that further revelations could lead to circumvention of the law. *See also Reporters Comm. for Freedom of the Press v. FBI*, 2021 U.S. Dist. Lexis 129425 * 24 (D.D.C. 2021) (revealing further details about the undercover communications in this case could provide criminals valuable details as to the types of devices, technology, and procedures used in this type of undercover operation, and would decrease the efficacy of the FBI's undercover techniques, in turn allowing future criminals to more easily evade detection by law enforcement). As argued above, Plaintiff cannot show that any of these specific undercover techniques have been officially acknowledged.

Finally, "the FBI protected the URLs of non-public databases used for official law enforcement purposes by the FBI, as well as search results of these databases, on Bates pages 153, 156, and 220. "The fact that the withheld database URLs were used for law enforcement

16

intelligence gathering renders these URLs eligible for withholding under Exemption 7(E)." 3d Seidel Decl. at 14-15 ¶ 20(c). "Releasing non-public database URLs or database-specific information would open those databases up to potential intrusion, especially given that they are specifically associated with an FBI investigation and known to contain information that the FBI relied on to conduct investigative activity." *Id*. "The fact that the FBI does not itself maintain these non-public databases has no bearing on the fact that releasing their URLs could allow criminals to more easily access sensitive information." Thus, the FBI properly protected this information pursuant to Exemption 7(E). The Court concludes that Defendants have met their modest burden of demonstrating logically how the release of [internal website/url network path] might create a risk of circumvention of the law. *Shem-Tov v. DOJ*, 2020 U.S. Dist. Lexis 90866 **38-39 (D.D.C. 2020). That the link is not an FBI link is of no moment and Plaintiff has not demonstrated how this fact lowers risk of circumvention of the law.

March 11, 2022                                                      Respectfully submitted,

                                                                    MATTHEW M. GRAVES, D.C. Bar #481052
                                                                    United States Attorney

                                                                    BRIAN P. HUDAK
                                                                    Acting Civil Chief

                                                                    By:       /s/
                                                                    KENNETH ADEBONOJO
                                                                    Assistant United States Attorney
                                                                    Judiciary Center Building
                                                                    555 4th Street, N.W. – Civil Division
                                                                    Washington, D.C. 20530
                                                                    Telephone: (202) 252-2562

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the foregoing Defendant's Motion to Enlarge Time to be served upon Plaintiff's counsel via ECF.

                                                      /s/
                                         KENNETH ADEBONOJO
                                         Assistant United States Attorney