## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANDRES F. CABEZAS,

      *Plaintiff*,

      v.

FEDERAL BUREAU OF
INVESTIGATION,

      *Defendant*.

Civil Action No. 1:19-cv-145 (CJN)

## MEMORANDUM OPINION

In response to an ad posted by law enforcement, Andres Cabezas communicated with someone he believed to be a 12-year-old child and described in explicit detail the sexual acts he intended to perform on the child. *See United States v. Cabezas*, No. 617CR148ORL40TBS, 2017 WL 6512551, at *1 n.1 (M.D. Fla. Dec. 20, 2017). Cabezas later pleaded guilty to receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2). He has now filed this lawsuit seeking records relating to his investigation, prosecution, conviction, and sentencing. *See generally* Compl., ECF No. 1. The Bureau has moved for summary judgment on the grounds that it conducted an adequate search, withheld information for legitimate reasons, and satisfied its segregability obligations. *See* FBI's Mot. for Summ. J. ("FBI's Mot."), ECF No. 37. Cabezas has filed a cross-motion for summary judgment on the grounds that the Bureau conducted an unreasonable search and failed to discharge its duties under the Privacy Act, 5 U.S.C. § 552a, *et seq.*, and the Freedom of Information Act, 5 U.S.C. § 552 *et seq. See* Cabezas' Cross-Mot. for Summ. J. ("Cabezas' Cross-Mot."), ECF No. 43. For the reasons that follow, the Court grants the Bureau's motion for summary judgment and denies Cabezas' cross-motion for summary judgment.

## I.       Legal Standards Applicable to the Freedom of Information Act

FOIA requires "federal agencies to make their records available to the public upon request." *DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015); *see* 5 U.S.C. § 552(a)(3). An agency must conduct a reasonable search for responsive records. *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). But agencies may withhold from disclosure information that falls within one of nine enumerated exemptions. *See United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021); *see* 5 U.S.C. § 552(b). Those nine "exemptions are explicitly made exclusive and must be narrowly construed." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). Furthermore, as of 2016, an agency may only withhold information under an exemption if the agency "reasonably foresees that disclosure would harm an interest protected by [the] exemption" or if "disclosure is prohibited by law." *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 357–58 (D.C. Cir. 2021) (quoting 5 U.S.C. § 552(a)(8)(A)(i)). The agency carries the burden of proving the applicability of an exemption and showing either a foreseeable risk of harm or that the law prohibits disclosure. *See Petroleum Info. Corp. v. Department of the Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015) (quotation omitted) (noting that district courts must review *de novo* the agency's justification for non-disclosure).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An agency may attempt to meet its summary judgment burden through a declaration or an affidavit, but conclusory

declarations or affidavits "that merely recite statutory standards or are overly vague or sweeping" will not suffice. *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009).

In cases involving significant withholdings, agencies often provide a so-called *Vaughn* index "to enable the court and the opposing party to understand the withheld information" and to "address the merits of the claimed exemptions." *Jud. Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 150 (D.C. Cir. 2006); *see also Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) (originating the term "*Vaughn* index"). An adequate *Vaughn* index provides "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977). The *Vaughn* index, in other words, must "state the exemption claimed for each deletion or withheld document, and explain why the exemption is relevant." *Founding Church of Scientology of Wash., D.C. v. Bell*, 603 F.2d 945, 949 (D.C. Cir. 1979).

Even where a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information must be disclosed. 5 U.S.C. § 552(b); *see Porup v. Cent. Intel. Agency*, 997 F.3d 1224, 1238 (D.C. Cir. 2021) (quotation omitted) ("FOIA provides that any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."); *see also Porup*, 997 F.3d at 1238 ("We have held that a trial court must make a segregability finding if a federal agency has redacted or withheld documents pursuant to FOIA exemptions."). An "agency must provide a detailed justification" for its determination that non-exempt materials cannot be segregated from exempt materials, but the agency need not "provide so much detail that the exempt material would be effectively disclosed." *Johnson v. Exec. Office for U.S. Attys.*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quotation

omitted); *Mead Data Cent., Inc.*, 566 F.2d at 260 (noting that a "document must be disclosed unless they are inextricably intertwined with exempt portions").  "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

## II.      Legal Standards Applicable to the Privacy Act

The Privacy Act mandates that each "agency that maintains a system of records shall . . . upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him . . . to review the record and have a copy made of all or any portion thereof in a form comprehensible to him."  5 U.S.C. § 552a(d)(1).  The Privacy Act also allows individuals to request notice that an agency's system of records contains information about them.  *See* 5 U.S.C. §§ 552a(e)(4)(G), (f)(1).

FOIA and the Privacy Act are similar in some ways and different in others.  Both statutes provide "a requester with access to federal agency records about the requester and create a private cause of action when an agency fails to comply with a valid request."  *Carlborg v. Dep't of the Navy*, No. 18-CV-1881 (DLF), 2020 WL 4583270, at *3 (D.D.C. Aug. 10, 2020) (describing further similarities).  The Privacy Act, unlike FOIA, concerns itself with safeguarding "the public from unwarranted collection, maintenance, use and dissemination of *personal information* contained in agency records."  *Bartel v. Fed. Aviation Admin.*, 725 F.2d 1403, 1407 (D.C. Cir. 1984) (emphasis added).  FOIA, by contrast, provides a means by which citizens may "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

Given FOIA and the Privacy Act's differences, where an individual requests documents under both statutes, "the responding agency must demonstrate that the documents fall within some exemption under each Act."  *Kearns v. Fed. Aviation Admin.*, 312 F. Supp. 3d 97, 106 (D.D.C.

2018) (quotation omitted).   Where a FOIA exemption covers a document, but a Privacy Act exemption does not, the document must be released under the Privacy Act.  *See Schneider v. U.S. Dep't of Just.*, 498 F. Supp. 3d 121, 127 (D.D.C. 2020).  On the flipside, where a Privacy Act exemption covers a document, but a FOIA exemption does not, the document must be released under FOIA.  *Id.*

### III.      Factual & Procedural Background

In 2017, Cabezas pleaded guilty to receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2).  *See Cabezas*, 2017 WL 6512551 at *1.  He received a 151-month sentence.  *See United States v. Cabezas*, 797 F. App'x 415, 416 (11th Cir. 2019).  Cabezas appealed both.  *Id.* (explaining the basis of Cabezas' appeal).

About a year into serving his sentence, and while his appeal remained pending, Cabezas submitted a FOIA request to the Bureau, requesting information, data, and reports related to his arrest and conviction.  *See* Compl. ¶ 7.  In June 2018, the Bureau sent Cabezas a letter acknowledging his request.  *See* Declaration of David M. Hardy, ECF No. 9-3 at ¶ 6.  Cabezas filed this lawsuit six months later.  *See* Compl.

In his Complaint, Cabezas alleges that he never received a response and that the "withholding of items sought amounts to a refusal to produce," which violates his "statutory right to receive" them under FOIA and the Privacy Act.  Compl. ¶¶ 13–14.  He seeks an order not only enjoining the Bureau from continuing to withhold responsive records, but also compelling the Bureau to "produce the requested records without further delay."  *Id.*

While Cabezas' appeal remained pending, the Bureau moved for summary judgment, arguing in large part that FOIA Exemption 7(A) exempted material from disclosure because of the appeal.  *See* FBI's First Mot. for Summ. J., ECF No. 9 at 17; Second Declaration of Michael G. Seidel, ("2d Seidel Decl."), ECF No. 37-3 at ¶¶ 2–3; *see also* 5 U.S.C. § 552(b)(7)(A) (noting that

an agency need not make available information where "the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings").

Once Cabezas' appeal ended, the Bureau withdrew its motion for summary judgment and searched for responsive records.  *See* 2d Seidel Decl. ¶ 4.  The Bureau searched its file and case management records system known as the Central Records System (or CRS for short).  *See* 2d Seidel Decl. ¶¶ 12–16.  CRS "spans the entire FBI organization" and "is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the [Bureau] in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency."  *Id.*; *Kolbusz v. Fed. Bureau of Investigation*, No. 117CV00319EGSGMH, 2021 WL 1845352, at *9 n.15 (D.D.C. Feb. 17, 2021) (providing details on what the CRS is and how it works).  The Bureau released 176 pages in full, released in part 41 pages and 2 videos, and withheld in full 74 pages pursuant to various FOIA exemptions and the Privacy Act.  *Id.*  It also provided Cabezas with a *Vaughn* Index. *See Vaughn* Index, ECF No. 37-4, Ex. F at 26.

The Bureau then renewed its motion for summary judgment.  *See* FBI's Mot.  It argues that it conducted an adequate search and withheld information in compliance with the Privacy Act as well as FOIA Exemptions 5, 6, 7(C) and 7(E).  *See generally Id.*  In particular, the Bureau claims that it "conducted a comprehensive search of its CRS database using its associated indices" and disclosed all disclosable, responsive material.  FBI's Mem. in Opp'n to Pl.'s Cross-Motion ("FBI's Opp'n"), ECF 51 at 2.

Cabezas cross-moved for summary judgment, contending that the Bureau conducted an unreasonable search, and that it failed to discharge its duties in good faith under the Privacy Act

and FOIA.  *See* Cabezas' Cross-Mot.  Generally speaking, Cabezas argues that the Bureau failed to produce records he had earlier obtained through criminal discovery, which he claims casts doubt on the thoroughness of the Bureau's search.  *Id.*  In response to this argument, the Bureau conducted a targeted search for material contained outside of CRS and made supplemental disclosures as a result.  *See* Third Declaration of Michael G. Seidel ("3d Seidel Decl."), ECF No. 51-1 at ¶ 3.

## IV.    Adequacy of the Search

In responding to a FOIA request, an agency must conduct a reasonable search for responsive records.  *Oglesby*, 920 F.2d at 68; *Bigwood v. United States Dep't of Def.*, 132 F. Supp. 3d 124, 135 (D.D.C. 2015) ("A court assesses the adequacy of the federal agency's search for responsive records by applying a reasonableness test.").  In most FOIA cases, "the agency establishes the adequacy of its search by submitting a detailed and nonconclusory affidavit on a motion for summary judgment."  *In re Clinton*, 973 F.3d 106, 113 (D.C. Cir. 2020).  Such an affidavit must explain "in reasonable detail the scope and method of the search conducted by the agency" for the search to pass muster.  *Wolf v. CIA*, 569 F. Supp. 2d 1, 7 (D.D.C. 2008) (quoting *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982)); *Mobley v. C.I.A.*, 806 F.3d 568, 581 (D.C. Cir. 2015) (quotation omitted) (noting that "agency affidavits—so long as they are relatively detailed and non-conclusory—are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents").

Here, Michael G. Seidel, the Section Chief for Record Dissemination for the Bureau, has provided multiple declarations that explain the innerworkings of the Bureau's document management system and how the Bureau utilized that system to search for responsive records in this case.  *See generally* 2d Seidel Decl.; 3d Seidel Decl.  In particular, Seidel states that the Bureau directed its search efforts by searching the automated indices in CRS.  *See* 2d Seidel Decl. ¶ 20.

Seidel further states that such a search offers "access to a comprehensive, agency-wide set of indexed data on a wide variety of investigative and administrative subjects" and represents "the most reasonable means for the [Bureau] to locate records potentially responsive to [FOIA] requests." *Id.* Seidel also states that the Bureau "employs an index search methodology," and in this case, the Bureau conducted a "string" search consisting of "Cabezas' names: "Andres Fernando Cabezas, Andres F. Cabezas, and Andres Cabezas" to locate responsive records. *Id.* ¶ 24. As a result of the search, the Bureau released 176 pages in full, released in part 41 pages and 2 videos, and withheld in full 74 pages pursuant to various FOIA exemptions and the Privacy Act. *See id.* ¶ 4.

The Bureau's disclosures did not end there. In response to Cabezas' cross-motion for summary judgment, the Bureau conducted additional searches. *See* 3d Seidel Decl. ¶ 3. In particular, the Bureau contacted a special agent in Florida who maintains Cabezas' criminal file and requested additional searches for material located outside of the database system. *Id.* Those additional searches turned up audio recordings and photographs. *Id.* Indeed, even Cabezas acknowledges "[t]o the [Bureau's] credit" that it "at least tried to partially cure its prior deficient search by expanding the s[earch] to the Tampa Field Office." *See* Cabezas' Reply to Opp'n to Bureau's Cross-Mot. for Summ. J. ("Cabezas' Reply"), ECF No. 53 at 5.

The Court concludes that the Bureau conducted a reasonable search calculated to locate records responsive to Cabezas' request. The Bureau utilized CRS to search for records about Cabezas. Given that Cabezas requested information about himself, it was reasonable to assume that responsive material would be located there because CRS contains the Bureau's "information about individuals, organizations, events, and other subjects of investigative interest for future retrieval." *Id.* The Bureau also conducted supplemental searches for information about Cabezas,

which brought to light additional material.  What's more, Seidel's second and third declarations not only detail that the Bureau searched within the correct records management systems, but also that the Bureau did so in a manner reasonably calculated to retrieve records responsive to Cabezas' request.  *See generally* 2d Seidel Decl.; 3d Seidel Decl.   The Bureau conducted a reasonable and an adequate search.

Cabezas argues that the Bureau's initial search did not do enough to smoke out "misconduct" on behalf of the Bureau when it came to his prosecution.  *See* Cabezas' Cross-Mot. at 19.  He contends that the "CRS search should only be a beginning, not an end, and in this case, [and that the Bureau] has not indicated it completed more than a 'targeted search' for the missing records." Cabezas' Reply at 10.  And he supports this contention with the argument that the Bureau failed to produce numerous records he obtained through criminal discovery.  The Bureau, however, responded to this argument by conducting targeted searches of the Bureau's Tampa Field Office, which led to additional disclosures.  *See* 3d Seidel Decl. ¶ 3.  What's more, Cabezas appears to equate requests made under FOIA and the Privacy Act with discovery in criminal and habeas proceedings.  But such requests do not serve as substitutes for discovery in criminal cases or in habeas proceedings.  *See Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1177 (D.C. Cir. 2011).  The U.S. Attorney's Office has certain material and information that falls under its purview, which agencies like the Bureau have little to no control over.  *See Coss v. U.S. Dep't of Just.*, 133 F. Supp. 3d 1, 5 (D.D.C. 2015).  All this leads to the conclusion that Cabezas' assertion that the Bureau did not conduct a reasonable search in good faith must fail because the Bureau's initial search and its supplemental searches were adequate under the law.

## V.     The Bureau's Withholdings under the Privacy Act

Recall that FOIA and the Privacy Act share much in common.  Yet differences do exist. As a result, where a Privacy Act exemption covers a document, but a FOIA exemption does not,

the document must be released under FOIA.  *See Boyd v. Exec. Off. for United States Att'ys*, 87 F. Supp. 3d 58, 87 (D.D.C. 2015).  The reverse holds true, too.  Where a FOIA exemption covers a document, but a Privacy Act exemption does not, the document must be released under the Privacy Act.  *Id.*

Here, the Bureau has invoked Privacy Act Exemption (j)(2).  *See* 5 U.S.C. § 552a(j)(2). That exemption shields from disclosure systems of records "maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal law, including police efforts to prevent, control, or reduce crime or to apprehend criminals."  *Id.*  Agencies may promulgate rules to exempt search systems and indices from disclosure requirements under the Privacy Act.  *See* 5 U.S.C. § 552a(d), (j), (k).  The Department of Justice has promulgated regulation 28 C.F.R. § 16.96(a)(1), which exempts the Bureau's law enforcement records maintained in CRS, *Bolze v. Exec. Off. for United States Att'ys*, No. CV 17-2858 (FYP), 2021 WL 5564633, at *2 n.4 (D.D.C. Nov. 29, 2021).  Many courts have therefore concluded that law enforcement records found in CRS are exempt from disclosure under the Privacy Act.  *See Mobley v. C.I.A.*, 924 F. Supp. 2d 24, 67 (D.D.C. 2013); *Marshall v. FBI*, 802 F.Supp.2d 125, 134 (D.D.C. 2011) (holding that the "CRS records are exempt from disclosure under the Privacy Act").

The Court concludes that the Bureau has carried its burden with respect to its withholdings under the Privacy Act.  The records responsive to Cabezas' request constitute law enforcement records compiled in the course of the Bureau's investigation of Cabezas' receipt of child pornography.  Those records are shielded from disclosure under the Privacy Act pursuant to 28 C.F.R. § 16.96(a)(1), and 5 U.S.C. § 552a(j)(2).

But just because the Privacy Act applies to shield material from disclosure does not answer whether they must be produced pursuant to FOIA.

## VI.   The Bureau's Withholdings under FOIA Exemption 5

FOIA's Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). That Exemption "incorporates the privileges available to Government agencies in civil litigation," including, as relevant here, the deliberative process privilege and the attorney-client privilege. *See United States Fish & Wildlife Serv. V. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021).

### A.  The Deliberative Process Privilege

The deliberative process privilege "shields from disclosure documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Id.* (quotation omitted). The privilege seeks to facilitate candid communication among public officials, as it "blunts the chilling effect that accompanies the prospect of disclosure." *Id.*; *see also Department of the Interior v. Klamath Water Users Protective Association*, 532 U.S. 1, 8–9 (2001) (noting that the "privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news").

To qualify for the deliberative process privilege, the agency must demonstrate that the material is (1) pre-decisional, (2) deliberative, and (3) that it is reasonably foreseeable that release of the material would cause harm to an interest protected by that privilege. *See Reps. Comm. for Freedom of the Press*, 3 F.4th at 361; *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015) (Kavanaugh, J.). A document counts as pre-decisional when it was "generated before the agency's final decision on the matter," "as opposed to documents that embody or explain

11

a policy that the agency adopts." *United States Fish & Wildlife Serv.*, 141 S. Ct. at 786 (noting that the key "is not whether a document is last in line, but whether it communicates a policy on which the agency has settled").  A document counts as "deliberative" when it was "prepared to help the agency formulate its position."  *Id.*; *Reps. Comm. for Freedom of the Press*, 3 F.4th at 364 (describing deliberative documents as those involving the "type of back-and-forth exchange of ideas, constructive feedback, and internal debate over how best to promote and to preserve the undercover policy that sits at the heart of the deliberative process privilege").  And it is reasonably foreseeable that the release of the material would cause harm to an interest protected by that privilege when the agency "concretely explains how disclosure would—not could—adversely impair internal deliberations."  *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369–70.  That showing turns on "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward."  *Id.*

The Bureau has invoked the deliberative process privilege to protect information "related to inter-agency deliberations."  2d Seidel Decl. ¶ 37.  In particular, the withheld material includes suggestions regarding the Bureau's "operational strategies, as well as . . . communications with an Assistant United States Attorney who was consulted and provided advice regarding investigative strategy related to Cabezas' case."  *Id.*

The Bureau has sufficiently demonstrated that the withheld material is both pre-decisional and deliberative.  As reflected in the Seidel declarations, the withheld material involved portions of operational plans and investigative suggestions.  *Id.*  That material is "pre-decisional in that it does not reflect final agency decisions."  *Id.*  What's more, "the investigative suggestions offered in the operational plan were memorialized prior to agency action in the official operation and do

not necessarily reflect final operational decisions." *Id.* In other words, the operational plans "were contingent on predicted scenarios that were only speculated to potentially occur." 3d Seidel Decl. ¶ 18. The Court concludes that the material withheld pursuant to the deliberative process privilege was both pre-decisional and deliberative.

But that does not end the matter. In addition to having to show that the material is pre-decisional and deliberative, the Bureau must also show that it is reasonably foreseeable that release of the withheld material would cause harm to an interest protected by the privilege. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369–70. To do so, the Bureau must explain "how disclosure would—not could—adversely impair internal deliberations," which turns on "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.*

The Bureau has demonstrated that harm is reasonably foreseeable in that release of the withheld material would cast a chilling effect on the willingness of employees to share raw, unrefined ideas and candid feedback should they know it could become subject to public disclosure. *See* 2d Seidel Decl. ¶ 37. In particular, release of the withheld material would harm future Bureau investigations by exposing the Bureau's "internal investigative plans and strategies." *Id.* Release could also "result in hesitancy [among Bureau employees to] participate fully in [future] deliberations." *Id.* What's more, release of such material could create confusion between what counts as a final Bureau decision, which could cast doubt on the actual of the Bureau's findings. *Id.*

Cabezas pushes back, contending that the withheld material under the deliberative process privilege constituted a final decision and thus cannot be characterized as pre-decisional. *See*

Cabezas' Cross-Mot. at 24.  In particular, Cabezas argues that the operational plan received final approval and thus cannot be deemed pre-decisional.  *Id.*  The Bureau, however, drafted the plan "in anticipation of a specific operation," which makes its pre-decisional.  3d Seidel Decl. ¶ 18; *Heggestad v. U.S. Dep't of Just.*, 182 F. Supp. 2d 1, 10 (D.D.C. 2000).  But if that were not enough, the Bureau withheld only "portions of the operational plan" containing "legal analysis of the validity of the [Bureau's] actions within [Cabezas'] criminal case."  3d Seidel Decl. ¶ 18.

## B. The Attorney-Client Privilege

The attorney-client privilege aims "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169–170 (2011) (quotation omitted).  To establish that the attorney-client privilege applies in the FOIA context, an agency must show that (1) "the information in [the] documents was communicated to or by an attorney as part of a professional relationship," (2) "the information is confidential," and (3) the "communication is based on confidential information provided by the client."  *Mead Data Cent., Inc.*, 566 F.2d at 253–54;  *Pub. Citizen, Inc. v. United States Dep't of Educ.*, 388 F. Supp. 3d 29, 40 (D.D.C. 2019) (noting that the privilege must also be claimed and not waived by the client).  "In the FOIA context, the agency is the 'client' and the agency's lawyers are the 'attorneys' for the purposes of attorney-client privilege." *Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 802 F.Supp.2d 185, 200 (D.D.C. 2011).

The Bureau has invoked the attorney-client privilege "to protect privileged communications between its investigators and the Department of Justice."  FBI's Mot. at 21.  In particular, the Bureau asserted attorney-client privilege to protect confidential communications "between [the Bureau] seeking legal advice from a professional legal adviser in his/her capacity

as a lawyer." 2d Seidel Decl. ¶ 39. Disclosure of the legal advice at issue would "disrupt the adversarial process of litigation by providing access to information related to the government's potential legal strategies." *Id.* Disclosure could also dissuade attorneys from sharing all relevant material and from speaking frankly. *Id.* The Court concludes that the Bureau's withholdings fall within the attorney-client privilege and the FOIA exemption.

Cabezas challenges this conclusion, arguing that that "there is nothing confidential about [his] arrest," and that "the Bureau "could have no reasonable expectation of confidentiality in information to be used in a criminal prosecution." Cabezas' Cross-Mot. at 27. Cabezas' argument is misplaced. The Bureau has invoked the attorney-client privilege to shield communications between investigators and prosecutors in which legal advice was sought, which counts as a lawful exercise of the FOIA Exemption 5. *See Kolbusz v. Fed. Bureau of Investigation*, No. 117CV00319EGSGMH, 2021 WL 1845352, at *15 (D.D.C. Feb. 17, 2021) (concluding that the Bureau properly asserted "attorney-client privilege to withhold information in 13 pages of responsive documents, which include summaries of meetings between FBI agents and AUSAs and emails between FBI agents and AUSAs").

## VII.    The Bureau's Withholdings under Exemption 6 and Exemption 7(C)

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "Similar files" include "detailed Government records on an individual which can be identified as applying to that individual." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146–47 (D.C. Cir. 2015) (quotation omitted). Exemption 6 also covers "bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy." *Judicial Watch, Inc.*, 449 F.3d at 152 (quotation omitted). For Exemption 6 to apply, the disclosure must compromise a privacy interest. *See Prison Legal News*, 787 F.3d at 1147. The

agency may satisfy its burden of showing a substantial invasion of privacy through affidavits containing "reasonable specificity of detail rather than merely conclusory statements." *Besson v. United States Dep't of Com.*, No. 18-CV-02527 (APM), 2020 WL 4500894 (D.D.C. Aug. 5, 2020) (quotation omitted). If the information does implicate a significant privacy interest, the Court must "balance the individual's right of privacy against the public interest in disclosure." *See Prison Legal News*, 787 F.3d at 1147. The FOIA requester must satisfy its obligation to articulate a significant public interest sufficient to outweigh the individual's privacy interest. *Pinson v. Dep't of Just.*, 236 F. Supp. 3d 338, 367 (D.D.C. 2017).

Exemption 7(C) excuses from disclosure "records or information compiled for law enforcement purposes" if their production "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Exemption 7(C)'s privacy language casts a wider net than the comparable language in Exemption 6. *See People for the Ethical Treatment of Animals v. Nat'l Institutes of Health, Dep't of Health & Hum. Servs.*, 745 F.3d 535, 541 (D.C. Cir. 2014). As a result, courts have "no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)." *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1173 (D.C. Cir. 2011).

Here, the Bureau contends that "each piece of information was scrutinized to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the documents at issue." 2d Seidel Decl. ¶ 45. Based on that scrutiny, the Bureau withheld names and identifying information of Bureau officials, staff, third parties, informants, and persons of investigative interest. *Id.* ¶¶ 44–54. The Bureau determined that the individuals' privacy interests outweighed any public interest in disclosure of names and identifying

information.  *Id.* ¶ 45.  The Court agrees:  The withheld information protects recognized privacy interests and Cabezas has not shown an overriding public interest in release of this information.

Cabezas challenges the Bureau's Exemption 6 and 7(C) withholdings on the grounds that some of the names appear in the public domain and have been acknowledged, and that sufficient public interest exists in exposing purported law enforcement "misconduct" to offset any privacy interest tipping in the Bureau's favor.  *See* Cabezas' Cross-Mot. at 19–22.  Some law enforcement personnel names may have been public, but the Bureau "continues to assert that release of these employees' names within the specific investigative context of these records would constitute an unwarranted invasion of privacy and would put these employees at unnecessary risk of retaliation and potential violence." 3d Seidel Decl. ¶ 19(c).  Associating a particular employee with a particular investigation "could lead to harassment, targeting, or retaliation against those employees by criminals who may hold a grudge due to that specific investigative action." *Id.* ¶19(a).  What's more, Cabezas alludes to government misconduct but he fails to identify any specific misconduct. As a result, the Bureau's privacy interest in not disclosing names and identifying information outweighs Cabezas' claim of public interest.  *See* 3d Seidel Decl. ¶ 19.

## VIII.   The Bureau's Withholdings under Exemption 7(E)

Exemption 7(E) permits the withholding of records that are "compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  *See* 5 U.S.C. § 552(b)(7)(E).  To justify a withholding under Exemption 7(E), the Bureau "must demonstrate that: (1) the records were compiled for law enforcement purposes, . . . (2) the redacted information would disclose techniques and procedures for law enforcement investigations or prosecutions, or

would disclose guidelines for law enforcement investigations or prosecutions, . . . and (3) the release of the requested information might create a risk of circumvention of the law." *Shapiro v. Dep't of Just.*, 393 F. Supp. 3d 111, 115 (D.D.C. 2019) (quotations omitted).  Exemption 7(E) "sets a relatively low bar for the agency to justify withholding, . . . and where an agency specializes in law enforcement, its decision to invoke" Exemption 7(E) receives substantial deference. *Levinthal v. Fed. Election Comm'n*, 219 F. Supp. 3d 1, 6 (D.D.C. 2016) (quotations omitted).

The Bureau withheld records under Exemption 7(E) in a number of categories, including: (1) undercover operations, (2) tactical information contained in operational plans, and (3) database information and search results.  *See generally* 2d Seidel Decl.

As to the first (undercover operations), the Bureau "relies on undercover operations as a useful investigative technique to conduct investigations" and "protected various forms of undercover communications used in the investigation of" Cabezas.  *See* 2d Seidel Decl. ¶ 59. Releasing details about the Bureau's undercover investigative techniques and the Bureau's operational security methods runs the risk of undercutting effective undercover operations.  In other words, "disclosure would decrease the efficacy of the [Bureau's] undercover techniques, in tum allowing future criminals to more easily evade detection by law enforcement."  *See* 3d Seidel Decl. ¶ 20(a).  The Court concludes that the Bureau withheld such information in conformity with Exemption 7(E).

As to the second (tactical information contained in operational plans), the Bureau protected a detailed operational plan containing tactical information related to Cabezas' arrest.  *See* 3d Seidel Decl. ¶ 20(b).  The operational details included within the plan covered the gambit, such as the "placement of personnel, administrative and equipment information, deadly force authorization information, targets background information, briefing locations, and legal consultations with the

United States Attorney's Office."  2d Seidel Decl. ¶ 60.   Releasing the "operational plan would allow criminals to extrapolate the [Bureau's] methods and priorities to other operations and enterprises" and would enable them to gain valuable insight to circumvent Bureau operations.  *See* 3d Seidel Decl. ¶ 20(b).  The Court concludes that the Bureau withheld the operational plan in conformity with Exemption 7(E).

As to the third (database information and search results), the Bureau withheld "URLs and sensitive details of investigative databases and database search results located through queries of these nonpublic databases used for official law enforcement purposes by the" Bureau.  2d Seidel Decl. ¶ 6.  Releasing "database URLs or database-specific information would open those databases up to potential intrusion."  *See* 3d Seidel Decl. ¶ 20(c).  And releasing "these URLs employed for investigative purposes would allow criminals to more easily access and exploit sensitive information."  *Id.*   The Court concludes that the Bureau properly withheld this database information and the search results under Exemption 7(E).

Cabezas argues that the Court should not approve the Bureau's Exemption 7(E) withholdings of "purported" undercover communications because the "information withheld per this exemption has already been disclosed to the public."  Cabezas' Cross-Mot. at 20–21.  But Cabezas cannot show that the Bureau has acknowledged all of the withheld undercover techniques. *See* 3d Seidel Decl. ¶ 20(a) ("The [Bureau] has released limited information regarding undercover operations and communications in order to mirror information that was identically located in the public record.").   Revealing additional details could provide potential wrongdoers further information about the Bureau's operations and could decrease the efficacy of the Bureau's techniques.

### IX.    The Bureau's Segregability Analysis

FOIA requires that if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information must be disclosed after redaction of the exempt information. 5 U.S.C. § 552(b).  To establish that all such information has been disclosed, an agency needs to show "with reasonable specificity" that the information it has withheld cannot be further segregated.  *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578–79 (D.C. Cir. 1996) (quotation omitted); *Canning v. DOJ*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which may be overcome by some "quantum of evidence" by the FOIA requester.  *Sussman*, 494 F.3d at 1117.

Here, the Bureau reviewed the records for any material in the public domain relating to Cabezas.  According to Seidel, the Bureau "did not withhold any reasonably segregable, nonexempt portions from" Cabezas.  2d Seidel Decl. ¶ 29.  Instead, the Bureau "endeavored to segregate non-deliberative facts, whenever possible, and only withheld such material when it found it was inextricably intertwined with agency deliberations."  *Id.* ¶ 38.  And Seidel states that, after "extensive review of the documents at issue," the Bureau "has determined that there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information."  *Id.* ¶ 66.

Cabezas argues that, even assuming some of the withheld material falls under an exemption, the Bureau withheld entire documents instead of just the exempted portions of them. *See* Cabezas' Cross-Mot. at 24.  In particular, Cabezas targets the Bureau's withholding of large portions of the operational plan.  But Seidel has declared that the factual information throughout the plan "is so intertwined and cannot be segregated."  2d Seidel Decl. ¶ 18.  Indeed, the plan includes information about Cabezas' arrest, "placement of personnel, administrative and

equipment information, deadly force authorization information, targets' background information, briefing locations, and legal consultations with the United States Attorney's Office" all of which makes seamless segregation unfeasible. *Id.* The Court concludes that Cabezas has failed to overcome the presumption that the Bureau disclosed all segregable information.

## X.    Conclusion

For the foregoing reasons, the Bureau's motion for summary judgment is **GRANTED** and Cabezas' cross-motion for summary judgment is **DENIED**. An Order will be entered contemporaneously with this Memorandum Opinion.

DATE:  March 28, 2022

CARL J. NICHOLS
United States District Judge